**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAUREN NADLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HONEYWELL INTERNATIONAL, INC. d/b/a HONEYWELL,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lauren Nadler ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Honeywell International, Inc., d/b/a Honeywell ("Defendant" or "Honeywell"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on her own personal knowledge.

## NATURE OF THE ACTION

1. This is a class action against Defendant Honeywell for false and misleading representations that it made and continues to make about its Honeywell HEPA Air Purifiers that come equipped with the Filter R and the standalone Filter R Replacement Products (collectively, the "Products")[1]. Defendant markets and sells the Products in multiple distribution channels, including but not limited to Amazon.com, Walmart, Best Buy, Target, and on its own website (www.honeywellstore.com).

[1] The various models, including HPA090 series, HPA100 series, HPA200 series, HPA250 series, HPA300 series, HPA3100-HPA3300 series, HPA5100-HPA5300 series and HPA8350 series, are all models compatible with the Filter R and are substantially similar in that they either use the same replacement R filters or the same substandard filter materials as a basis for their common HEPA claims.

2. Defendant represented that the Products were equipped with High Efficiency Particulate Air (HEPA) filters and met HEPA filtration standards when, in fact, they did not.

3. Independent testing by Plaintiff's counsel has shown that the filters used in the Air Purifiers and the replacement filters do not meet HEPA standards.

4. Reasonable consumers have had no opportunity to find this out for themselves because they cannot conduct HEPA standard testing. Instead, reasonable consumers rely on the representations Defendant makes on its Products.

5. Defendant also misrepresented that its products were "True HEPA" and "Certified HEPA." That claim is misleading for three reasons. The Products did not in fact meet the HEPA performance standard, Plaintiff is informed and believes that Defendant has not individually tested and verified each of its Products to be HEPA-grade in accordance with its certification claim, and there is no such certification program for HEPA filters. The only applicable measure is whether a filter complies with established HEPA performance standards and testing protocols, such as those governed in the United States by the Institute of Environmental Sciences and Technology ("IEST").

6. Defendant knew its Products did not meet HEPA standards but continued to sell the Air Purifiers *and* Replacement R Filters, capitalizing on consumer demand for these Products since the outset of the COVID-19 pandemic.

7. Defendant has profited greatly from the explosion in the air purifier market brought about by the COVID-19 pandemic and yearly "once-in-a-lifetime" wildfires that have ravaged the United States. Consumers are rightfully concerned about maintaining indoor spaces that are free of harmful pathogens and contaminants. As a result, a large portion of Defendant's gargantuan profits are attributable to its false HEPA filtration claims.

8. But for Defendant's HEPA claims, the fair value of its Air Purifiers would have been substantially lower (*i.e.*, their market price would have been closer to non-HEPA air purifiers, which sell at a discount compared to air purifiers with HEPA filters). Put differently, Defendant's HEPA misrepresentations allowed it to overcharge consumers in the amount of the HEPA-related price premium—assuming there would be a market for Defendant's non-HEPA filters at all.

9. Relatedly, Defendant's false and misleading representations induced reasonable consumers like Plaintiff to purchase the Products. Had Plaintiff and all other similarly situated consumers known that—contrary to Defendant's knowing representations—the Products did not have HEPA filters or were actually "Certified HEPA," they would have paid less for the Products or not purchased them at all.

10. Plaintiff is now seeking a return of the HEPA-related premiums that Defendant charged for its Products, on behalf of herself and other similarly situated purchasers for violations of: (i) New York's General Business Law ("GBL") § 349; (ii) New York's GBL § 350; (iii) breach of express warranty; (iv) fraud; and (v) unjust enrichment.

**PARTIES**

11. Plaintiff Lauren Nadler is a citizen of New York, who resides in Brooklyn, New York, and intends to stay there. On February 27, 2023, while in New York, Plaintiff Nadler purchased a Honeywell HPA100 HEPA Air Purifier and Honeywell HEPA Air Purifier Filter Value Kit with A and R Filters from BestBuy for $102.99 and $58.99, respectively. Plaintiff Nadler reviewed and relied on Defendant's warranties and representations about the Products' HEPA filters prior to purchasing the Products. Specifically, Plaintiff Nadler saw that the Products were labeled as Certified HEPA. Plaintiff Nadler reasonably relied on Defendant's representations and believed that the Products had HEPA-standard filters that were tested and

met HEPA standards. Defendant's false and misleading HEPA representations induced reasonable consumers like Plaintiff into purchasing the Products. Plaintiff Nadler associated the HEPA label with an assurance for high-quality filtration and paid a price premium for the Products for this reason. Had Defendant not warranted and represented that its Products had HEPA filters and the Product was "Certified HEPA," Plaintiff Nadler would not have purchased the Products or would have paid substantially less for them. This price premium constitutes a concrete economic injury.

12. Defendant Honeywell International, Inc. is a Delaware company, headquartered in Charlotte, North Carolina. Defendant Honeywell International, Inc. manufactures, markets, sells, and distributes the Products throughout the contiguous United States, including New York. Defendant Honeywell International, Inc. manufactured, marketed, and sold the Products at issue at all times during the relevant class period.

13. Honeywell controls and approves the design, labeling, and marketing of the Products, including the "True HEPA" and "Certified HEPA" statements. Even if third parties assist in manufacturing or distribution, Honeywell sets the specifications and the advertising claims that appear on the Products and benefits from the price premium tied to those claims. Honeywell is therefore responsible for the representations challenged in this Complaint.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

15. This Court has personal jurisdiction over the parties because Plaintiff resides in New York, is a citizen of New York, and submits to the jurisdiction of the Court, and because

Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in this State. Defendant therefore has sufficient minimum contacts with this state, including within this District, and/or intentionally availed itself of the benefits and privileges of the New York consumer market through the promotion, marketing, and sale of its Products to residents within this District and throughout this State.

16. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant transacts significant business within this District, Plaintiff resides within this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## FACTUAL ALLEGATIONS

### A. AIR PURIFIERS AND THE AIR-PURIFIER MARKET

17. The Environmental Protection Agency (EPA) estimates that "about 67 million tons of pollution were emitted into the atmosphere in the United States" in 2021 alone. This pollution comes at great cost to human health: "[t]he combined effects of ambient air pollution and household air pollution are associated with 6.7 million premature deaths annually."[2] Exposure to air particulates has also been linked to symptoms of depression, cognitive decline, and increased feelings of anxiety.

18. Air pollution can also be a visceral reminder of human-driven climate change: the smoke from wildfires that have raged across both coasts of the United States since 2020 has at times blocked out the sun and forced millions of people indoors. For many, the smoke has exacerbated health conditions such as asthma or emphysema.

[2] *Ambient (outdoor) air pollution*, World Health Organization (Oct. 24, 2024), https://www.who.int/news-room/fact-sheets/detail/ambient-(outdoor)-air-quality-and-health#:~:text=The%20combined%20effects%20of%20ambient,6.7%20million%20premature%20deaths%20annually.

19. As a result, public concern about air pollution is high. In fact, one 2019 survey found that, of about 1000 responses, 43% of respondents indicated that they had a "great deal" of concern about air pollution in the United States and 31% indicated that they had a "fair amount" of concern about air pollution. Taken together, 74% of respondents expressed concern about air pollution. This is in line with the EPA's concerns – the agency places indoor air pollution among the top five environmental health risks.

20. Concern about air quality skyrocketed in 2020, however, as wildfires intensified and the airborne COVID-19 virus shut down the globe.

21. As expected, consumer concern over airborne contaminants has helped the air-purifiers market explode: the air purifier market size is estimated at $18.01 billion USD in 2025 and is expected to reach $25.26 billion USD by 2030:[3] "The COVID-19 pandemic has increased the demand for air purifiers, with the growing awareness of COVID-19 associated respiratory ailments and the rising need to curb cross-contamination. Factors such as increasing airborne diseases and growing health consciousness among consumers are driving the market."[4]

22. Air purifiers come in various forms. Among the most effective purifiers are those with HEPA filters. HEPA, as defined above, is an acronym for "High Efficiency Particulate Air." HEPA filters are strictly designed and must adhere to certain specifications to be designated as HEPA.

---

[3] Research and Markets, *Air Purifier - Market Share Analysis, Industry Trends & Statistics, Growth Forecasts (2025-2030)*, WWW.RESEARCHANDMARKETS.COM, https://www.researchandmarkets.com/reports/4987153/air-purifier-market-share-analysis-industry (last visited September 11, 2025).

[4] Research and Markets, *Air Purifier Market Outlook, 2028*, WWW.RESEARCHANDMARKETS.COM, https://www.researchandmarkets.com/reports/5775014/air-purifier-market-outlook#:~:text=Covid%2D19%20Impact:,growth%20of%20the%20market%20studied (last visited Sept. 25, 2025).

23. Specifically, a HEPA filter is a type of pleated mechanical filter that typically consists of sheets of randomly arranged fiberglass or plastic fibers held in an accordion shape by aluminum separators. To be called a HEPA filter, the filter must capture at least 99.97% of dust, pollen, mold, bacteria, and any airborne particles with a size of 0.3 microns (µm)."[5]

24. According to the Centers for Disease Control and Prevention (CDC), HEPA filters "are the most efficient filters on the market for trapping particles that people exhale when breathing, talking, singing, coughing, and sneezing."[6]

25. For example, even though the SARS-CoV-2 virus is about 0.125 microns in diameter, the CDC has stated that "air purifiers can help reduce airborne contaminants, including viruses, in a home or confined space."[7]

26. The reason why consumers care that the air purifier they purchase meets the HEPA standard is self-evident. It offers near certain protection against the transmission of airborne pathogens in the home (if the purifier is given enough time to circulate the air), and it can also filter out pollution caused from events like wildfires, which are growing ever more frequent.

27. Consumers want the assurance that the HEPA standard provides, and they are willing to pay more for HEPA filters, *i.e.*, consumers are willing to pay a premium for filters that meet the HEPA standard.

28. Being able to make a 99.97% "HEPA-filtration" claim is thus a huge boon for manufacturers, and they know it. The HEPA standard claim is a signal to consumers that the

---

[5] https://www.epa.gov/indoor-air-quality-iaq/what-hepa-filter

[6] Centers for Disease Control and Prevention. *Improving Ventilation in Your Home*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/improving-ventilationhome (last accessed April 3, 2024).

[7] *Id.*

product they are purchasing has been constructed to exacting standards and is able to provide superlative levels of filtration.

29. The materiality to consumers of HEPA representations is further confirmed by enforcement actions taken by regulators including the Federal Trade Commission, which has, among other things, entered into Consent Decrees with manufacturers of air purifiers for claims made about the efficacy of their HEPA purifiers and filters. *See, e.g., In the Matter of Honeywell,* FTC File No. 962-3154.[8]

30. While Defendant makes a number of representations about the capabilities of its Products, "HEPA" is front and center. Ultimately, Defendant knows that consumers are primarily driven to make their purchase based on the presence of "HEPA" in the Product's name or on the Product' s packaging. Consumers would not have purchased or would have paid significantly less for Defendant's Products if the word HEPA was not present – even if all of the other marketing representations remained, such as filtration efficiency figures. Consumers value HEPA far more than any of the other marketing terms and technical information that Defendant provides.

**B. DEFENDANT'S PRODUCT AND ADVERTISING**

31. At issue in this action are Defendant's Air Purifiers that come equipped with R Filters and the standalone R Filter Replacement Products, which Defendant claims are "HEPA."

32. The Products are cylindrical and cube-shaped devices that accept a filter. The Air Purifiers range in price depending on the size of the device and the maximum area in square feet the device covers. The Air Purifier Plaintiff Nadler bought (which Defendant no longer sells) covers 155 square feet and regularly retailed for $139.99. Other Honeywell Air Purifiers that

[8] Available at https://www.ftc.gov/legal-library/browse/cases-proceedings/962-3154-honeywell-inc-matter.

also use the R Filter, such as the HPA094 model that covers a 155 square foot room, retail for $139.95 on the Honeywell website.[9] The AllergenPlus Air Purifier, which also uses the R Filter and covers up to 1500 square feet, retails for $178.00 on Amazon.[10]

33. Replacement filters for the Air Purifiers are cylindrical wheels or rectangular inserts, depending on the associated model. The R Replacement Filters for the compatible Air Purifiers retail for $36.95 for an individual filter[11] or $89.95 for a 3-pack[12] on the Honeywell website.




**Figure 1**[13] Honeywell HPA100 HEPA Air Purifier

---

[9] https://www.honeywellstore.com/store/products/true-hepa-tower-air-purifier-with-allergen-remover-hpa094wmp.htm

[10] https://www.amazon.com/Honeywell-HPA200-True-Allergen-Remover/dp/B00BWYO3EM/ref=sr_1_4?crid=2YPZNSVFCXUQB&dib=eyJ2IjoiMSJ9.6K7-KfE31PoNWajzmf9fGyOReUGwr_dCS5MvT64WFIj1UgTlUMDP8xO7Zd0Jn2bmdnecNxgj4iSTEi9TsXiel2QjS0o59lURr_XHdWpcOReyW2wwqTC_81aGRt46fik8WvydokZeVi0WzWbQLCfFlov0tj7GX02awjUCvMWVix56jSrM2xcPQpeNYyNrarw3svVc7Zo4rw8jaHrolAVM0a6fBf43425rdTBtIPiYj6A.EzRfwlq9ue8RZPXhvPL0ti7wDxucO_HgC1QRnDiECO0&dib_tag=se&keywords=honeywell%2Bair%2Bpurifier&qid=1757704507&sprefix=honeywell%2Bair%2Bpurifie%2Caps%2C190&sr=8-4&th=1

[11] https://www.honeywellstore.com/store/products/true-hepa-replacement-filter-r-hrf-r1.htm

[12] https://www.honeywellstore.com/store/products/true-hepa-replacement-filter-r-3-pack-hrf-r3.htm

[13] https://www.amazon.in/Honeywell-HPA100-True-Allergen-Remover/dp/B00BWYO2FW




**Figure 2**[14] Honeywell R Filter True HEPA Replacement Air Purifier Filter

34. Defendant crafted multiple false and misleading HEPA representations on its advertising for each of the Products. These HEPA representations were uniform and directed to the general public through national retailers and online listings, and thus were consumer-oriented in nature.

35. For instance, Defendant made the following express representations in the advertising for the Products:

a) "Certified HEPA;"

b) "Captures up to 99.97% of airborne particles at 0.3 microns from the air that passes through the filter;"

c) "Certified HEPA Air Purifier Filters;"

d) "True HEPA;"

[14] https://www.honeywellstore.com/store/products/true-hepa-replacement-filter-r-hrf-r1.htm

e) "True HEPA Replacement Filters."

36. Defendant makes the same implied representation: that the filters used in the Air Purifiers have been tested and performed to meet the "HEPA" standards for filtration. In reality, they do not.

37. Defendant further represents on its Products' packaging that its Products are "Certified HEPA," conveying to consumers that each of its Products' filters have been tested and verified to meet the HEPA standard and have been approved under a type of official certification program. In reality, there is no official "certification" program for HEPA filters.

38. Hundreds of thousands of consumers, including Plaintiff, have purchased the Products based on the HEPA Claims. They were convinced that they were purchasing a high-quality, high-performance, premium product. Unfortunately, they were duped. Defendant's HEPA Claims are entirely fabricated.

## C. DEFENDANT'S PRODUCTS WERE TESTED AND FAILED TO MEET THE ADVERTISED HEPA CLAIMS

39. As part of their investigation into the Products, Plaintiff's counsel commissioned a highly reputable and independent American laboratory to conduct testing on the Products. The results of the testing prove that Defendant's Products are not HEPA-grade.

40. The lab chosen by Plaintiff's counsel is often used by companies to validate their filters and is an industry leader in the rigorous and accurate testing of HEPA filters. The lab is certified by ANAB/ANSI, a non-governmental organization that provides accreditation services and training to public and private-sector organizations. Moreover, the lab is well known for its stringent adherence to the various HEPA testing protocols set forth by the European Union, the International Standards Organization, and the United States.

41. The testing was conducted in accordance with American testing protocols. In America, the protocol used to establish HEPA-grade is IEST-RP-CC001.7. The protocol tests for a filter's ability to filter out fine particles.

42. Under the IEST protocol, to be classified as a HEPA filter, the filter must have a filtration of at least 99.97%. Further, each and every filter sold as HEPA must be tested. Particles ranging in size from 0.1 microns to 3.0 microns are used in the test. The test is done over multiple stages, with each stage measuring the filtration efficiency for a subset of particle sizes (*e.g.*, measuring how the filter performs for particles between 0.1 and 0.2 microns, then measuring performance from 0.2 to 0.3 microns).

43. When Defendant's filter was tested under the IEST standard, the results were unambiguous. Across all tested particle sizes, the filters failed to reach the 99.97% threshold to be classified as HEPA. Defendant claims its Products are HEPA, which means the Products need to filter out at least 99.97% of particles. The results of the test are shown in the below chart; all results that fell below the HEPA standard are labeled in red.

| **Particle Size Range (µm)** | **Filtration Efficiency (%)** |
|---|---|
| 0.1 - 0.2 | 98.86 |
| 0.2 - 0.3 | 99.33 |
| 0.3 only | 99.57 |

.

44. Honeywell has long been aware of the HEPA performance standard requiring at least 99.97% efficiency at 0.3 microns. Honeywell previously entered an FTC consent decree concerning air filtration advertising, confirming that filtration claims must be substantiated by testing. Honeywell also represents to consumers and retailers that its filters are "individually tested" or "Certified HEPA," which conveys that each filter has been verified to meet the HEPA threshold. Honeywell therefore either knew or should have known that the filters at issue did not

meet the HEPA standard, yet continued to make the HEPA claims to capitalize on increased consumer demand.

45. Honeywell labeled the Products as "Certified HEPA," but there is no formal HEPA certification program. A filter can only be tested for compliance with the HEPA performance standard; there is no independent certifying body or approval process. By using the term "Certified HEPA," Honeywell falsely suggested a certification that does not exist and further implied that each filter had been individually tested and verified to meet the HEPA standard. Plaintiff is informed and believes that Honeywell did not in fact individually test or verify the filters, making the "Certified HEPA" claim affirmatively misleading.

**D. BUT FOR DEFENDANT'S HEPA MISREPRESENTATIONS, PLAINTIFF AND THE PROPOSED CLASS WOULD HAVE PAID LESS FOR THEIR AIR PURIFIER AND REPLACEMENT FILTERS**

46. By falsely claiming that its Air Purifiers have a "Certified HEPA" filter, and selling its replacement filters as "True HEPA," Defendant was able to overcharge Plaintiff and the putative class members in the amount of a HEPA-related premium associated with those claims. Plaintiff and Class members therefore suffered an economic injury in the form of a price premium.

47. Defendant's HEPA claims appeared on the webpages where its products were sold. Defendant's HEPA claims also appear on multiple sides of the Products' packaging. Accordingly, those claims were seen by all purchasers of Defendant's Air Purifiers and Replacement Filters.

48. Defendant's HEPA claims mislead reasonable consumers. Defendant is one of the nation's leading air purifier manufacturers, so consumers would reasonably believe Defendant's HEPA claims. Moreover, consumers do not and cannot typically test the accuracy

of a HEPA claim before purchasing an air purifier, and Defendant's HEPA claims were expressly false, not impliedly false.

49. If Defendant had been truthful in its representations about the Products (*i.e.*, that they were not HEPA-grade), then the market price of those purifiers and filters would have been lower.

50. Accordingly, Plaintiff and the proposed Class paid for Defendant's Products at artificially inflated prices.

## CLASS ALLEGATIONS

51. ***Class Definition.*** Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and all other similarly situated consumers, and seeks to represent a class (the "Class") defined as:

> All natural persons Nationwide who purchased a Honeywell HEPA Air Purifier that comes equipped with an R Filter and purchasers of the standalone R Replacement Filter (the "Class") during the applicable statutory period.

52. Plaintiff Nadler also seeks to represent a New York subclass (the "New York Subclass") defined as follows:

> All New York residents who purchased a Honeywell HEPA Air Purifier that comes equipped with an R Filter and purchasers of the standalone R Replacement Filter (the "New York Subclass"), during the applicable statutory period.

53. The Class and New York Subclass are collectively referred to as the "Classes."

54. All Class members were exposed to the same "HEPA" and "Certified HEPA" claims and paid the same price premium for the same reason.

55. Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's affiliates, parents, subsidiaries, officers, directors, co-

conspirators, agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

56. Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

57. ***Numerosity.*** Members of the Classes are so numerous that their individual joinder herein is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail, email, publication and/or other media, including social media.

58. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to:

a) Whether the Products are in fact HEPA-grade;

b) Whether Defendant's express representations about the capability of the Products included false and/or misleading statements and/or omissions;

c) Whether Defendant knowingly made false HEPA claims about the Products, including that each of its Products were "True HEPA" and/or "Certified HEPA;"

d) Whether Defendant's HEPA representations were material;

e) Whether an objectively reasonable consumer would have been misled by Defendant's HEPA claims; and

f) Whether Defendant's HEPA claims allowed it to charge more for the Products than it otherwise could have.

59. ***Typicality.*** Plaintiff's claims are typical of the claims of the proposed Classes she seeks to represent because Plaintiff, like all members of the Classes, was induced by Defendant's false and misleading warranties to purchase Defendant's Products without knowing that the Defendant's claims about the Products' filter were false and misleading. The representative

Plaintiff, like all members of the classes, has been damaged by Defendant's misconduct in the very same way as the members of the classes. Further, the factual bases of Defendant's misconduct are common to all members of the classes and represent a common thread of misconduct resulting in injury to all members of the classes.

60. ***Adequacy***. Plaintiff is an adequate representative of the Classes she seeks to represent because her interests do not conflict with the interests of the members of the Classes. Plaintiff has retained competent counsel that are experienced in prosecuting class actions and she intends to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

61. ***Superiority***. A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individual litigation also represents a potential for inconsistent or contradictory judgments. By contrast, the class-action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
**Violation of New York Business Law § 349 ("GBL")**
**On Behalf of Plaintiff and New York Subclass Members**

62. Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

63. Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

64. This claim is brought pursuant to the laws of the State of New York.

65. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

66. Defendant committed deceptive acts and practices by employing false, misleading, and deceptive representations about its Products.

67. Information as to the capacity, efficacy, and certifications of these Products was in Defendant's exclusive control. Plaintiff could not possibly have known that the Products at issue were not being sold as advertised, as such information was not available to the public.

68. Defendant's deceptive acts and practices were directed at consumers.

69. Defendant's deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations. Defendant knew consumers would purchase its Products and/or pay more for them under the false—but reasonable—belief that these Products met HEPA filtration standards and were "Certified HEPA."

70. Defendant knows that advertising about its Products is material to consumers. If such information were not material, Defendant would not have marketed its Products as "True HEPA" or "Certified HEPA." As a result of its deceptive acts and practices, Defendant sold at least tens of thousands of Products to unsuspecting consumers across New York.

71. If Defendant had advertised its Products truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased them or would not have paid as much as they did for them.

72. As a direct and proximate result of Defendant's false, misleading, and deceptive

representations, Plaintiff and other members of the New York Subclass were injured in that they would not have purchased the Products, or would have paid substantially less for them, but for Defendant's misrepresentations about the quality of its Products.

73. On behalf of herself and Members of the New York Subclass, Plaintiff seeks to recover her actual damages or fifty (50) dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT II**
**Violation of New York GBL § 350**
**(On Behalf of Plaintiff and the New York Subclass Members)**

74. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

75. Plaintiff brings this claim individually and on behalf of the New York Subclass against Defendant.

76. This claim is brought pursuant to the laws of the State of New York.

77. New York General Business Law Section 350 declares unlawful "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

78. New York General Business Law Section 350-a(1) defines false advertising as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual."

79. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products because they misrepresent the HEPA status of its Products. By misrepresenting the true capacity of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

80. Defendant had exclusive knowledge of the capacity of its Products.

81. Defendant's misrepresentations and omissions were material because consumers are concerned with efficacy of the air purifiers they purchase.

82. As a result of Defendant's misrepresentations and omissions, Plaintiff and members of the Class and Subclass have suffered economic injury because they would not have purchased the Products, or would have paid substantially less for them, if they had known that the Products did not meet HEPA filtration standards or were not "Certified HEPA."

83. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, consumers continue to be exposed to Defendant's material misrepresentations.

84. As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and members of the New York Subclass are entitled to monetary, statutory damages of $500 per violation, compensatory, treble and punitive damages, restitution, and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT III**
**Breach of Express Warranty**

85. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

86. Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendant under the laws of New York.

87. As alleged in detail above, Defendant misrepresented material facts about its Products, including misrepresenting to consumers that the Products had "Certified HEPA" and "True HEPA" filters, despite knowing that they did not.

88. Defendant was in a position to know the true quality and capability of its Products but affirmatively warranted that the Products had Certified and True HEPA filters, when in truth they did not.

89. Substantial benefits have been conferred on Defendant by Plaintiff and the Class through the purchase of the Products. Defendant knowingly and willingly accepted and enjoyed these benefits.

90. In connection with the sale of the Products, Defendant, as the producer, marketer, distributor, and/or seller issued written warranties by representing the following about the Products and R Replacement filters:

a) "Certified HEPA;"

b) "Captures up to 99.97% of airborne particles at 0.3 microns from the air that passes through the filter;"

c) "Certified HEPA Air Purifier Filters;"

d) "True HEPA;"

e) "True HEPA Replacement Filters."

91. Plaintiff and the Class members relied on these statements in making their purchasing decisions.

92. In fact, the Products do not conform to these representations because none of these claims are true. As described more fully above, the Products were tested and shown to perform well below the HEPA standard, and thus the Products do not have a HEPA filter.

93. Plaintiff and Class members were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased the Products if they had known

that Defendant's representations about the Products were false, and (b) they overpaid for the Products on account of the misrepresentation.

94. On or about March 17, 2025, Plaintiff's counsel notified Defendant of Plaintiff's claims in a demand letter shortly after learning about Defendant's breach of warranty, sent via certified mail, with return receipt requested.

95. The demand letter was sent within a reasonable time after Plaintiff discovered Defendant's breach and learned of the nature of Defendant's practices. The letter therefore complied with all respects of U.C.C. § 2-607.

**COUNT IV**
**Fraud**

96. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

97. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant under the laws of New York.

98. As alleged in detail above, Defendant knowingly misrepresented that the Products contained HEPA filters that met the required efficiency standard.

99. Defendant was in a position to know (and did know) the true quality and capability of its Products, but it affirmatively warranted that the Products had HEPA filters, when in truth, they did not. In fact, Plaintiff is informed and believes that Defendant knew through its own testing that its Products were not HEPA-grade, and were being falsely advertised as having "Certified HEPA" filters.

100. Defendant's misrepresentations, upon which Plaintiff and the members of the Class relied, were intended to induce, and actually did induce, Plaintiff and the members of the Class to purchase the Products. Defendant induced Plaintiff and the members of the Class to purchase the Products that Plaintiff and the members of the Class would not have purchased, or

would have paid substantially less for, had Defendant been truthful about the quality and capability of its Products.

101. Defendant's fraudulent actions caused damages to Plaintiff the Class, and Subclass members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT V**
**Unjust Enrichment**

102. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

103. Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

104. As alleged in detail above, Defendant misrepresented material facts about its Products, including by misrepresenting to consumers that the Products had "Certified HEPA" filters, despite knowing that they did not.

105. Defendant was in a position to know the true quality and capability of its Products but affirmatively warranted that the Products had "Certified HEPA" filters, when in truth they did not.

106. Substantial benefits have been conferred on Defendant by Plaintiff and the Class through the purchase of the Products. Defendant knowingly and willingly accepted and enjoyed these benefits.

107. Defendant either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Products would contain "Certified HEPA" filters. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

108. Defendant's acceptance and retention of these benefits of the payments from Plaintiff and the Class under the circumstances alleged herein make it inequitable for Defendant

to retain the benefits without payment of the value to Plaintiff and the Class.

109. Plaintiff and the Class are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant.

110. Defendant accepted and retained the benefit in the amount of the gross revenues derived from sales of the Products to Plaintiff and the members of the Classes.

111. Defendant has thereby profited by retaining the benefit under circumstances that would make it unjust for Defendant to retain the benefit.

112. Plaintiff and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

113. As a direct and proximate result of Defendant's actions, Plaintiff and the members of the Classes have suffered in an amount to be proven at trial.

114. Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which she is entitled.

115. Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiff and members of the Class are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed classes the following relief against Defendant:

(a) An order certifying the Nationwide Class, and New York Subclass and naming Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

(b) An order declaring that Defendant's conduct violates the statutes and common law reference herein;

(c) Compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(d) Prejudgment interest on all amounts awarded;

(e) An order of restitution and all other forms of equitable monetary relief;

(f) An order requiring Defendant to undertake a corrective advertising campaign;

(g) An order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

(h) Granting such other and further relief as many be just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 31, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Alec M. Leslie*
Alec M. Leslie

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice* forthcoming)
Luke Sironski-White (*pro hac vice* forthcoming)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
lsironski@bursor.com

**SINDERBRAND LAW GROUP, P.C**.
Greg Sinderbrand (*pro hac vice* forthcoming)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

*Attorneys for Plaintiff*